IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

**FILED**

APR 16 2010

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

UNITED STATES OF AMERICA,

        Plaintiff,

v.                            Civil Action No. 2:10-0498

SHIDA S. JAMIE, JAMES S. "JIMMY" JAMIE,
AND GOLDEN HEART IN HOME CARE, LLC,

        Defendants.

## COMPLAINT FOR INJUNCTIVE RELIEF

Now comes the United States of America ("United States"), and pursuant to 18 U.S.C. § 1345, seeks to enjoin defendants Shida S. Jamie, James S. "Jimmy" Jamie, and Golden Heart In Home Care, LLC, from the commission of all Federal health care offenses as defined by 18 U.S.C. § 24.  The United States further seeks to enjoin the alienation and disposition of property or assets derived from the commission of such offenses, and a restraining order freezing such property and assets and prohibiting any person from withdrawing, transferring, removing, dissipating or disposing of such property or assets or property or assets of equivalent value.  In support of this complaint, the United States incorporates the Affidavit of Special Agent Mary Ann Withrow of the Office of Investigations, Office of Inspector General, United States Department of Health and Human Services, filed contemporaneously herewith. ("Withrow Aff.")

<u>JURISDICTION AND VENUE</u>

1.   Jurisdiction is proper under 18 U.S.C. § 1345, and 28 U.S.C. §§ 1331, 1345.

2.   Venue is proper pursuant to 28 U.S.C. § 1391(b).

<u>PARTIES</u>

3.   Plaintiff is the United States.

4.   Defendant, Shida S. Jamie ("Shida Jamie") is the founder, owner and Executive Director of Golden Heart In Home Care, LLC and a private citizen of the State of West Virginia with her last known address at 1998 Parkwood Road, Charleston, West Virginia 25314. (Withrow Aff. ¶ 5)

5.   Defendant James S. "Jimmy" Jamie ("Jimmy Jamie") is the son of Defendant Shida Jamie, and claims publicly to be the "Owner", "President" and/or "Chief Executive Officer" of Golden Heart In Home Care, LLC.  Jimmy Jamie is a private citizen of the State of West Virginia with his last known address at 1998 Parkwood Road, Charleston, West Virginia 25314. (Withrow Aff. ¶ 6)

6.   Defendant Golden Heart In Home Care, LLC ("Golden Heart") is a West Virginia Limited Liability Company founded and wholly owned by Shida Jamie, with its primary business located at 510 4th Street, Saint Albans, West Virginia 25177.   Golden Heart also operates offices in Clay, West Virginia and Montgomery, West Virginia.   Golden Heart specializes in providing in-home care services to the elderly and disabled.   (Withrow Aff. ¶ 7)

2

<u>RELEVANT STATUTES</u>

7.   The fraud injunction statute, 18 U.S.C. § 1345, authorizes injunctive relief to stop anyone committing or about to commit a Federal health care offense, and to prevent the alienation or disposition of property traceable to a Federal health care offense or property of equivalent value.

8.   The term Federal health care offense is defined in 18 U.S.C. § 24, and includes criminal violations of 18 U.S.C. §§ 669, 1035, 1347, and 1581; and 18 U.S.C. §§ 287, 371, 664, 666, 1001, 1027, 1341, 1343, or 1954, if the violation or conspiracy relates to a health care benefit program.  18 U.S.C. § 24(a)  Health care benefit program means any public or private plan or contract, affecting commerce, under which any medical benefit, item or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.  18 U.S.C. § 24(b).

<u>BACKGROUND</u>

<u>Medicaid</u>

9.   Medicaid is a federal health care benefit program, co-funded by the United States and state governments, established to provide medical assistance for indigent individuals who are aged, blind, disabled or members of families with dependent children. (Withrow Aff. ¶ 8)

10. In West Virginia, Medicaid ("WV Medicaid") is administered by the West Virginia Department of Health and Human Resources, ("WVDHHR") through the Bureau of Medical Services ("BMS"). Individuals insured by WV Medicaid are known as "members." (Withrow Aff. ¶ 9)

11. WV Medicaid offers a comprehensive scope of medically necessary medical and mental health services to diagnose and treat eligible members. In order for services to be covered, they must be rendered by enrolled WV Medicaid providers within the scope of their license and in accordance with all state and federal requirements. (Withrow Aff. ¶ 10)

12. WV Medicaid providers are paid for covered services through the submission of claims. Claims for payment include, *inter alia,* information about the member, the nature of the service provided, the charge for the service provided, the date of service, and information about the provider. Claims may be submitted on paper or electronically. (Withrow Aff. ¶ 11)

13. As a condition of payment by WV Medicaid, the provider must certify that the information on the claim is true, accurate, and complete; that payment and satisfaction of the claim will be made from federal and state funds; and any false claims, statements, or documents or concealment of a material fact, may be prosecuted under applicable federal or state laws. The provider

making the claim is responsible for all of the information provided on the claim form.  (Withrow Aff. ¶ 12)

14.   Generally, WV Medicaid reimburses enrolled providers for covered services based on established fees depending on the service identified on the claim and the qualifications of the service provider.  (Withrow Aff. ¶ 13)

15.   At all times relevant to this Complaint, Golden Heart was an enrolled WV Medicaid Provider.  (Withrow Aff. ¶ 14)

<u>The Aged and Disabled Waiver Program</u>

16.   The Aged and Disabled Waiver ("ADW") Program is a long-term care alternative, administered by WV Medicaid through the Bureau of Senior Services ("BoSS"), which allows qualified members to receive in-home care and avoid the disruption and expense of institutional care.  (Withrow Aff. ¶ 15)

17.   To become an authorized provider of ADW services ("ADW Provider"), an applicant must be an enrolled Medicaid Provider and must complete an ADW Services Provider Agreement ("ADW Provider Agreement").  (Withrow Aff. ¶ 16)

18.   The ADW Provider Agreement requires applicants to, *inter alia,* comply with all ADW program requirements, maintain documentation of services rendered, and provide qualified staff in accordance with program regulations and manuals.  (Withrow Aff. ¶ 17)

19.  At all times relevant to this Complaint, Golden Heart was an authorized ADW Provider.  (Withrow Aff. ¶ 18)

<u>Criminal Histories</u>

20.  Because of the extraordinarily vulnerable population served by the ADW Program, ADW Providers are required to complete, at a minimum, a state level Criminal Investigation Background check for all applicants seeking employment as in-home care providers, hereinafter referred to as "homemakers".  (Withrow Aff. ¶ 19)

21.  Criminal histories that may place a member at risk of personal health and safety or demonstrate a history of Medicaid fraud and abuse must be considered by ADW Providers before employing such individuals.  (Withrow Aff. ¶ 20)

22.  ADW Providers are prohibited from approving, employing utilizing or considering for employment, anyone with a history of the following criminal convictions:

      a.  abduction;

      b.  any violent felony crime including but not limited to rape, sexual assault, homicide, felonious physical assault or felonious battery;

      c.  child/adult abuse or neglect;

      d.  crimes that involve the exploitation of a child or an incapacitated adult;

      e.  felony domestic battery or domestic assault;

      f.  felony arson;

   g. felony or misdemeanor crime against a child or incapacitated adult which causes harm;

   h. felony drug related offenses within the last 10 years;

   i. felony DUI within the last 10 years;

   j. hate crimes;

   k. kidnapping;

   l. murder/homicide;

   m. neglect or abuse by a caregiver;

   n. pornography crimes involving children or incapacitated adults including, but not limited to, use of minors in filming sexual explicit conduct, distribution and exhibition of material possessing, displaying or transporting material by a parent, guardian or custodian;

   o. purchase or sale of a child;

   p. sexual offenses including, but not limited to, incest, sexual abuse, or indecent exposure; and

   q. healthcare fraud.

(Withrow Aff. ¶ 21)

<u>Mandatory Training and Other Qualifications</u>

23. ADW Providers are required to have a review process to ensure that homemakers and other employees providing ADW services meet minimum qualifications. ADW Providers must maintain documentation of employee qualifications, such as licenses,

transcripts, certificates, signed confidentiality statements, and references.  (Withrow Aff. ¶ 22)

24.   ADW Providers are required to provide mandatory training for homemakers, maintain copies of training records and certifications in employee personnel files, and provide copies of training records and certifications to the employees.  (Withrow Aff. ¶ 23)

25. ADW Providers must provide new homemakers, who have no prior training or experience, with a minimum of eight (8) hours of basic training before allowing them to provide in-home care. Within twelve (12) months of employment, ADW providers must provide homemakers with an additional twenty-four (24) hours of training for a total of thirty-two (32) hours.  The initial eight (8) hours of training must cover the following areas:

a.   *Orientation to the agency, community, and services, including responsibilities regarding reporting changes in the member's condition and needs;

b.   Working with specific populations including the elderly, persons with behavioral disorders, and distinct categories of physical or cognitive disabilities;

c.   Body Mechanics;

d.   *Personal Care skills including, but not limited to, bathing, grooming, feeding, toileting, transferring, positioning, ambulation, range of motion, and vital signs;

8

e.   Care of home and personal belongings;

f.   *Accident prevention and safety;

g.   Food, nutrition, and meal preparation;

h.   *Occupational Safety and Health Administration standards related to blood-borne pathogens. Cardiopulmonary Resuscitation ("CPR"), and First Aid Training;

i.   *Adult Abuse, Neglect and Exploitation; and

j.   *Confidentiality laws and regulations (HIPAA). Areas marked with an asterisk (*) are mandatory and cannot be substituted or waived. The other training requirements may be waived if there is documentation in the employee personnel file establishing successful completion of a recognized training course, or one year of in-kind experience verified through written reference checks maintained in the employee personnel file. (Withrow Aff. ¶ 24)

26. In addition to the basic training set forth above, homemakers must complete eight (8) hours of annual in-service training designed to develop special skills or enhance skills learned in basic training. The in-service training must be documented. (Withrow Aff. ¶ 25)

27. OSHA, First-Aid, and Adult Abuse, Neglect and Exploitation training must be provided to homemakers every twelve (12) months. CPR certifications must be maintained in compliance

with American Heart Association or American Red Cross requirements. (Withrow Aff. ¶ 26)

<u>SUMMARY OF INVESTIGATION</u>

<u>News Reports</u>

28.  In April of 2009, Shida Jamie, Jimmy Jamie and Golden Heart were featured in a newspaper article in the Charleston Gazette-Mail entitled "State's own $2.2 million dollar man:  Tennis pro, health care executive Jimmy Jamie makes Parade list."  The article referenced a photo of Jimmy Jamie that had appeared on the cover of <u>Parade</u> magazine, "not far from Britney."  The article reported that Britney Spears had earned $2.25 million, and that Jimmy Jamie was "only $50,000 behind with $2.2 million."  In the article, Shida Jamie and Jimmy Jamie reportedly confirmed Jimmy Jamie's $2.2 million salary and attributed it to his association with Golden Heart, the "family business" started by Shida Jamie some three years prior.  The article explained that Golden Heart provides in-home care for the elderly and disabled.  Jimmy Jamie was quoted in the article as saying, "It's really the best thing. It lets people stay in their home with their families.  It's very important, but difficult work."  Shida Jamie was quoted as saying, "And, there's a lot of trust involved.  Older people are very vulnerable.  We're very careful to send the right person into a home.  Our care givers have a variety of training.  They all go through background checks, and we're always on the phone talking to

the family, making sure everything is OK." The article reported that Shida Jamie and Jimmy Jamie claimed that Golden Heart "bills for services through Medicare and Medicaid." (Withrow Aff. ¶ 27)

29. In January of 2010, the Sunday Gazette-Mail reported that more than 900 elderly and disabled West Virginians who qualified for in-home care were not able to receive care because of program funding shortages. The article reported that in November of 2009, the West Virginia Legislature allocated $2.5 million in supplemental appropriations, assuming that appropriation would eliminate or at least reduce the waiting list for in-home care services. WVDHHR officials advised that the additional allocation was used to pay bills for people already in the program, and was insufficient to provide services to new enrollees. (Withrow Aff. ¶ 28)

30. On March 7, 2010, an editorial in the Charleston Gazette noted that the numbers of elders who qualified for in-home care but were not getting help had risen to more than 1000. (Withrow Aff. ¶ 29)

<u>Complaints</u>

31. In or about July of 2009, the West Virginia Medicaid Fraud Control Unit ("WV MFCU") received a complaint that Golden Heart was billing for services not rendered. (Withrow Aff. ¶ 30)

32. Several months later, BoSS received an anonymous letter in which the complainant alleged that "Golden Heart In Home Care,

is committing fraud." The complainant claimed to have been employed by Golden Heart as a homemaker. The complainant reported that she had contacted Golden Heart to determine whether they were hiring and spoke directly with Shida Jamie. During the phone call, Shida Jamie asked if the complainant could begin work that day. Although the complainant reportedly advised Shida Jamie that her training "was expired," Shida Jamie assured her that it was "alright," she would "take care of it," and provided the complainant an address for an ADW member. The complainant reported that she worked for Golden Heart as a homemaker for two weeks before completing a job application. The complainant reported that she was eventually provided two (2) hours of training, but was asked to sign forms indicating that Golden Heart had provided a total of 32 hours of training. The complainant further reported that Shida Jamie directed her to falsify time sheets indicating that she had worked days and hours when she had not. The complainant reportedly refused to sign the falsified documents and terminated her employment with Golden Heart. The complainant indicated that she was not the only employee for whom Shida Jamie had created false documents, and that other homemakers were "afraid not to sign." The complainant further indicated that "these homemakers are working without any training of any kind." The complainant also alleged that Golden Heart was creating false "Red Cross" training cards for employees who had not received required

Red Cross training, presumably mandatory CPR and First Aid training. (Withrow Aff. ¶ 31)

33. The following day, Boss received another complaint about Golden Heart. The complainant alleged that a homemaker employed by Golden Heart was financially exploiting two disabled siblings in the ADW Program. Specific allegations included that a Golden Heart homemaker, the homemaker's son and his girlfriend had moved into the home of the siblings, were consuming food and gasoline paid for by the siblings, were driving the siblings' car for personal appointments, were making phone calls at the expense of the siblings, and were spending the siblings' inheritance excessively. (Withrow Aff. ¶ 32)

34. In early 2010, another complaint about Golden Heart was made to BoSS. The complainant alleged that in or about January of 2010, Golden Heart provided staff training to thirty homemakers at its office in Clay, West Virginia. The training was supposed to include CPR, Abuse and Neglect and proper completion of paper work. The CPR training was provided by "Crystal" and consisted of "CPR test booklets for review." There was no video or live demonstration, and no practice manikins. Forms supplied by Golden Heart to certify the CPR training were backdated.

During the training, employees were instructed to complete homemaker work sheets and daily logs (referred to as "time sheets") by the 15th of every month for the complete month, or threatened

that their paychecks would be withheld or they would be "replaced."
Homemakers were provided a monthly calendar that listed "maximum
hours" for which they were to provide services.   They were
instructed not to follow the member's plan of care or member
requests for hours of service, but rather to maximize hours
provided consistent with the calendars supplied.   The calendars
also included notes directing extra hours of service that were to
be performed by the homemakers each week.   Copies of some of the
documents supplied at the training were provided. (Withrow Aff.
¶ 33)

### Convicted Felons and Other Unqualified Homemakers

35.   Interviews conducted during the investigation of
complaints against Golden Heart established that Golden Heart was
not performing required Criminal Investigation Background checks,
was employing homemakers with significant criminal histories, was
paying some employees "under the table" and outside of the Golden
Heart payroll system, and was not providing mandatory training or
verification of prior experience, training, certifications or
licenses.  (Withrow Aff. ¶ 34)

36.   Further investigation established that six (6) homemakers
employed by Golden Heart were under the supervision of the federal
probation office in this district:

a.   M.H. - M.H. was convicted in February of 2005, of
violating 18 U.S.C. § 924(a)(1)(A) - knowingly making a false

14

statement on an ATF Form.  M.H. was sentenced to a 46 month term of imprisonment "to run consecutively to the state sentence that [M.H.] was currently serving."  M.H. was serving a state sentence for a conviction in April of 2002, for possession of cocaine with intent to deliver, a state felony drug offense.

M.H. reported that he was hired as a homemaker at Golden Heart in approximately August of 2008, and continued to work in that capacity through the date of the interview.  M.H.'s duties as a homemaker include house cleaning, fixing meals, driving members to appointments or to the grocery store (transportation), and other miscellaneous tasks as needed.  M.H.'s driver's license was reportedly suspended during this period due to a DUI arrest.  M.H. indicated that during his early employment with Golden Heart, he was paid "under the table by check."  Near the end of 2008, Shida Jamie reportedly advised M.H. that she had received an inquiry about his employment from the state child support agency. Thereafter, M.H. began receiving checks drawn on a Golden Heart account.  A check dated December 12, 2008, contains a signature that purports to be that of Shida Jamie, and a note that reads "for 11/30-12/06."  A review of wage reports from the West Virginia Bureau of Employment Programs ("BEP wage reports"), shows that Golden Heart did not begin to report wages for M.H. until the fourth quarter of 2009, nearly a year after the above-referenced check was issued.

b.   R.T. - R.T. was convicted on May 5, 2003, of violating 18 U.S.C. § 1708 and 2(a), aiding and abetting the possession of stolen mail. R.T. is a registered sex offender, with a lengthy criminal history including convictions for domestic battery, indecent exposure, forgery and uttering, worthless checks, fleeing a police officer, driving a vehicle without a valid operator's license, interference with an officer, receiving stolen property, and shoplifting. Though R.T. reports that he was employed as a homemaker for Golden Heart from August 2008 through May 2009, and that his work was supervised by Shida Jamie, R.T. does not appear on any BEP wage reports submitted by Golden Heart.

c.   B.M. - B.M. was convicted in January of 2007, of violating 21 U.S.C. § 841(a)(1), distribution of cocaine base, a felony drug offense. As early as June of 2009, and continuing through March of 2010, B.M. reports that she is employed by Golden Heart as a caregiver and that her immediate supervisor is "Sheida Jamie."

d.   T.B. - T.B. was convicted in August 2006, of violating 21 U.S.C. § 846, conspiracy to distribute five grams or more of cocaine base, a felony drug offense. T.B. reports that she is employed by Golden Heart as a homemaker and has produced paychecks drawn on the account of Golden Heart from as early as December of 2008, and continuing through January of 2010. T.B. claims that her immediate supervisor is "Jamie Shida."

16

e.    S.M. - S.M. was convicted in April of 2005, of violating 21 U.S.C. § 841(a)(1), distribution of cocaine base, a felony drug offense.  On April 8, 2009, S.M.'s supervised release was revoked for possession with intent to distribute five grams or more of cocaine base, and for using marijuana.  S.M. has a lengthy criminal history including convictions for domestic battery, battery, fleeing a police officer, and possession of marijuana.  In October of 2008, S.M.'s federal probation officer received a complaint that while S.M. was employed by Golden Heart as a homemaker, he offered to sell drugs to the individual for whom he was providing care.  S.M. does not appear on the BEP wage reports submitted by Golden Heart.

f.    M.A. - M.A. was convicted in June of 2005, of violating 21 U.S.C. § 841(a)(1), distribution of more than five grams of cocaine base, a felony drug offense.  M.A. claims to have been employed as a homemaker for Golden Heart since as early as July of 2008, though he does not appear on BEP wage reports submitted by Golden Heart until the second quarter of 2009.  M.A. claimed his supervisor at Golden Heart was "Jamie."  M.A. was reportedly paid to recruit other convicted felons to work as homemakers for Golden Heart. (Withrow Aff. ¶ 35)

37.  The investigation also identified L.C.   L.C. was convicted in April of 1998, of violating 21 U.S.C. § 841(a)(1), a felony drug offense.   L.C. was sentenced to 97 months of

imprisonment, and was released from supervised release in September of 2006. L.C. was convicted again in May of 2009, of violating 21 U.S.C. § 841(a)(1), a second felony drug offense. L.C. was interviewed while incarcerated.

L.C. reported that she was employed by Golden Heart as a homemaker for approximately one year beginning in October of 2008. L.C. advised that she was recruited by M.A. (¶ 36.f), and was hired by Shida Jamie. Though L.C. had been previously employed in a nursing home in another state, Shida Jamie never asked her to provide copies of certificates, licenses or proof of training. L.C. received approximately two (2) hours of training on a Saturday, and was given her first homemaker assignment the following Monday. L.C. completed a basic job application, which included work history, but was not required to provide copies of a valid driver's license, vehicle information or automobile insurance. L.C. believed that Shida Jamie personally reimbursed homemaker transportation costs for homemakers who were not licensed drivers. L.C.'s duties included cleaning, cooking, bathing, dressing, feeding and transporting members in her personal vehicle. L.C. reported that every member had the same care plan and that Golden Heart supplied homemakers with worksheets that had arrival and departure times completed in advance of arrival and departure. L.C. advised that Golden Heart frequently lost paperwork and that homemakers began to maintain their own copies to ensure proper

payment. L.C. reported that paperwork rarely made it into member's charts. L.C. recalled one occasion on which her signature was required on Golden Heart records in preparation for an audit. L.C. was reportedly unable to make it to the office, and assumes that someone forged her signature to the documents. L.C. recalled two separate occasions when she was directed by Shida Jamie to leave the home of one member and report to the home of another member. Shida Jamie instructed L.C. to record that she had provided services to both members for the maximum time. L.C. provided the names of members for whom she provided homemaker services on behalf of Golden Heart. The investigation has confirmed that Golden Heart billed Medicaid for homemaker services rendered to the identified members during the time of L.C.'s employment with Golden Heart. (Withrow Aff. ¶ 36)

38. Information obtained from the BEP wage reports submitted by Golden Heart was used to perform Criminal Investigation Background checks for employees for whom Golden Heart had reported wages. Of approximately 420 employees of Golden Heart 127 were found to have criminal histories. (Withrow Aff. ¶ 37)

39. The following eight employees identified from the BEP wage reports submitted by Golden Heart have criminal convictions that preclude Golden Heart from employing them as homemakers:

a. L.D. - convicted in April of 2006, for delivery of marijuana - a felony drug offense;

19

b.    A.J. - convicted in February of 2000, for distribution of crack cocaine - a felony drug offense; convicted July of 2001, while incarcerated, for maintaining a place for the purpose of distributing cocaine - a felony drug offense;

c.    L.R. - convicted in December of 2005, for possession of controlled substances - a felony drug offense;

d.    T.H. - convicted in April of 2002, for possession of controlled substances, a felony drug offense;

e.    T.M. - convicted in April of 2002, for transporting drugs to a jail - a felony drug offense;

f.    J.C. - convicted in July of 2005, for causing bodily injury with intent to retaliate against a federal witness;

g.    D.F. - convicted in March of 1999, for conspiracy to possess methamphetamine (offense occurred in a federal correctional facility), a felony drug offense;

h.    C.D. - convicted in July of 2001, for child abuse;

i.    L.B. - convicted in September of 1992 for aggravated assault;

j.    B.G. - convicted in March of 2005, for manufacture or delivery of controlled substance/cultivation of marijuana; convicted in July of 2002, for intentionally causing physical injury;

k.    T.J. - convicted in December of 2002, for DUI causing death; and

20

1.   D.W. - convicted in July of 2004, for domestic battery with display of a weapon.

(Withrow Aff. ¶ 38)

40.   Because the evidence developed to date establishes that Golden Heart employed homemakers who were not included on BEP wage reports and who were precluded from employment by Golden Heart because of their criminal histories, it is likely that additional disqualified homemakers will be identified as the investigation progresses.   (Withrow Aff. ¶ 39)

Failure to Provide Mandatory Training
<u>and Creation of False Training Documentation</u>

41.   In addition to the allegations set forth above regarding failure to provide mandatory training and falsification of training documents, a review of available training documents establishes that Golden Heart was not providing mandatory training to its homemakers and was falsifying training documents to make it appear that the mandatory training had been provided.   (Withrow Aff. ¶ 40)

42.   The personnel file for former Golden Heart homemaker "H.H." contained training documents, including a multiple choice quiz, entitled, "Are you 'In the Know' About Abuse and Neglect?" Three identical copies of the quiz were included in H.H.'s personnel file and dated 9/11/06, 9/11/07, and 9/11/08.   The answers on the quiz, H.H.'s signature, the supervisor signature, the score of 100%, and circles for the responses, appear identical for all three years.   The signature of Linda Gray, appears on the

"Supervisor Signature" line for all three years, notwithstanding that Linda Gray only appears on BEP wage reports submitted by Golden Heart for the 4th quarter of 2007, and the second quarter of 2008 - neither quarter coinciding with the dates on the quizzes. The year on two of the three quizzes appears to have been obliterated and altered.  (Withrow Aff. ¶ 41)

<u>Billing for ADW Services After Death</u>

43.  Golden Heart billed Medicaid for ADW services for member L.K.  L.K. died on May 27, 2009.  Golden Heart submitted claims to Medicaid seeking payment for homemaker services, registered nurse services and nursing assessments purportedly rendered in August, September, and November of 2009.  (Withrow Aff. ¶ 42)

<u>WV Medicaid Payments to Golden Heart</u>

44.  From October of 2006, through February of 2009, WV Medicaid paid Golden Heart $2,340,248 for homemaker services  and $356,981 in transportation services under the ADW Program. Payments were made by WV Medicaid through electronic fund transfers into bank accounts designated by Shida Jamie.  (Withrow Aff. ¶ 43)

<u>Dissipation of Assets</u>

45.  An administrative subpoena duces tecum, issued pursuant to 18 U.S.C. § 3486 (for investigations of federal health care offense), was served on the bank designated by Shida Jamie to receive WV Medicaid payments on behalf of Golden Heart.  The subpoena sought production of records for open and closed bank

accounts from January 1, 2006 to the present for Golden Heart, Shida Jamie and Jimmy Jamie. An analysis of the subpoenaed bank records shows the following:

Deposits made into a JP Morgan Chase Bank, Chase Business Classic checking account titled, Golden Heart In Home Care Services, LLC, opened on February 28, 2008, has been reviewed by law enforcement. The business address on this account is listed as 694 Winfield Road, Saint Albans, West Virginia 25177-1554. The account, account number ******2530, lists Shida Jamie, Member Managed, as the only individual with signatory authority on this account.

A review of account *****2530, shows that between February of 2008 and February of 2010, approximately $6 million was deposited into the account. While not all deposits are attributed to reimbursements of Medicaid billings submitted by Medicaid, Golden Heart requested that Medicaid's reimbursements to Golden Heart be electronically deposited into Golden Heart's account, account number ****2530. Although, on average, approximately $240,000 is deposited monthly into this account, the average end of the month balance for this account is approximately $67,000. A large portion of the total deposited funds for this account are quickly exiting the account prior to the end of the month. The account balance as of February 28, 2010, was $257,175.23.

A portion of the funds from account number *****2530 are transferred to JP Morgan Chase Bank, Chase Business Classic account, account number *****2522 titled, Golden Heart In Home Care Services, LLC, located at 894 Winfield Road, Saint Albans, West Virginia 25177-1554. This account was opened on February 28, 2008, and the authorized signatory for this account is Shida Jamie, Member Managed. This account appears to operate as a payroll account. A review of the bank statements for this account from March of 2008 through February 2010, shows that enough funds are transferred from account number *****2530 to this account in order to cover a number of electronic withdrawals that are described as being a "Basic Online Payroll Payment". The balance in this account as of February 28, 2010, is $500.

Deposits have been reviewed for a Chase Business Select High Yield Savings account titled, Golden Heart In Home Care Services, LLC, opened on February 28, 2008. The business address on this account is listed as 694 Winfield Road, Saint Albans, West Virginia 25177-1554. The account, account number ******8453, lists Shida Jamie, Member Managed, as the only individual with signatory authority on this account. A review of account number *****8453, shows that on February 28, 2009, a transfer from checking account *****4742, in the amount of $1,000 was deposited into the aforementioned account. On April 29, 2009, $450 of these funds were transferred to checking account number *****2530. No other

deposit or withdrawal transactions were noted in the bank statements. The current balance in this account as of February 28, 2010, is $554.38. (Withrow Aff. ¶ 44)

46. Jimmy Jamie is a subscriber and prolific poster on the social networking site "Facebook." Facebook users create a profile page that allows them to share information about themselves with friends and networks. Facebook users are able to upload photographs and make them available for viewing by others who have been granted access by the user. Photographs can be maintained in "albums" and the user, and others with access, can post comments associated with the photos.

On his Facebook profile, Jimmy Jamie claims to be the owner of Golden Heart In-Home Care in Montgomery, WV (May 2008-present), Clay, WV (January 2005-present), and Saint Albans, WV (May 2006-present). Jimmy Jamie notes, "I run the Golden Heart In Home Care Services with my mom [sic] we started it in 2006, and have grown to over 300 employees, with offices in 8 cities and 4 states. We are always hiring."

Jimmy Jamie has approximately 20 photo albums, that include titles such as "My twentieth ride", "My toys", "Blueprint, Snow, Vday, Bball Jan 09-April 09", and "My New Home IN Cleveland: Public Courts Pictures*more to come." Jimmy Jamie displays photos of himself and numerous vehicles including four late model Mercedes Benz sedans, three of which have vanity plates that read, "J Air

J", "Goldnhrt", and "JJ 23". He also displays photos of a Porsche 911 Carrera convertible, a Mini-Cooper, a motorcycle, and an all terrain vehicle. He has photos of what purports to be a building site in the upscale Quarry Creek subdivision of Charleston, with the comment, "future homesite already excavated 2.3 acres for 300g's." He has included photos of blueprints for "Crissy and Jimmys House," which include a pool, two workout rooms ("one for weights", and one for "cardio machines"), a third floor game room/ movie theatre/bar, basketball and tennis court with "lights and hitting wall" for a "Total Sq Footage of House 13,000 sq ft, but missing 1,000 from the two addition triangles." Jimmy Jamie has also posted photos of a luxury condominium complex in Cleveland Ohio, in the album "My new home IN Cleveland" including a photo of an address plate that reads "Penthouse 1018" and with his comment, "Gotta be the best Penthouse always." Other albums include photos of a Clay County farm and horses, vacations and other celebrations. (Withrow Aff. ¶ 45)

47. The BEP wage reports submitted by Golden Heart reflect $7,500 in wages for Jimmy Jamie in calendar years 2007 and 2008. (Withrow Aff. ¶ 46)

## REQUEST FOR INJUNCTIVE RELIEF

48. Each of the claims submitted by Golden Heart seeking payment from Medicaid for services provided by homemakers with disqualifying criminal convictions constitutes a Federal health

care offense, and mail or wire fraud, all of which are predicate offenses under the fraud injunction statute, 18 U.S.C. § 1345. (Withrow Aff. ¶ 47)

49. Each of the claims submitted by Golden Heart seeking payment from Medicaid for services provided by homemakers with no training or inadequate training constitutes a Federal health care offense, and mail or wire fraud, all of which are predicate offenses under the fraud injunction statute, 18 U.S.C. § 1345. (Withrow Aff. ¶ 48)

50. Each of the claims submitted by Golden Heart seeking payment from Medicaid for services reportedly provided after the death of the member constitutes a Federal health care offense, and mail and or wire fraud, all of which are predicate offenses under the fraud injunction statute, 18 U.S.C. § 1345. (Withrow Aff. ¶ 49)

51. Each of the claims submitted by Golden Heart seeking payment from Medicaid for services not rendered constitutes a Federal health care offense, and mail and or wire fraud, all of which are predicate offenses under the fraud injunction statute, 18 U.S.C. § 1345. (Withrow Aff. ¶ 50)

52. Each of the claims submitted by Golden Heart for transportation services provided by homemakers who did not have valid driver's licenses constitute a Federal health care offense, and mail and or wire fraud, all of which are predicate offenses

27

under the fraud injunction statute, 18 U.S.C. § 1345.   (Withrow Aff. ¶ 51)

53.   Shortly, the United States will seeking a federal search warrant to facilitate the identification and seizure of evidence to further support the allegations in this Complaint.   (Withrow Aff. ¶ 52)

<u>PRAYER FOR RELIEF</u>

WHEREFORE, the United States requests, pursuant to 18 U.S.C. § 1345, and the Court's inherent equitable powers that the Court enjoin defendants Shida S. Jamie, James S. "Jimmy" Jamie, and Golden Heart In Home Care LLC, from the commission of all Federal health care offenses as defined by 18 U.S.C. § 24.   The United States further requests that the Court enjoin the alienation and disposition of property or assets derived from the commission of such offenses, as well as a restraining order freezing such property and assets and prohibiting any person from withdrawing, transferring, removing, dissipating or disposing of such property or property of equivalent value.

Respectfully submitted,

CHARLES T. MILLER
United States Attorney

s/Carol A. Casto
Assistant United States Attorney
WV State Bar Number 890
Attorney for United States
P.O. Box 1713
Charleston, WV  25326
Phone: 304-345-2200
Fax: 304-347-5443
E-mail: carol.casto@usdoj.gov